## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

JENNIFER K. ZIEGLER,

       Plaintiff,

v.                                  Case No:  2:15-cv-538-FtM-99CM

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____

## REPORT AND RECOMMENDATION[1]

Plaintiff Jennifer K. Ziegler seeks judicial review of the denial of her claim for disability and disability insurance benefits ("DIB") by the Commissioner of the Social Security Administration ("Commissioner").  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons discussed herein, the Court recommends that the decision of the Commissioner be reversed and this matter be remanded pursuant to 42 U.S.C. § 405(g), sentence four.

### I.    Issues on Appeal[2]

Plaintiff raises several issues on appeal: (1) whether substantial evidence supports the Administrative Law Judge's ("ALJ") Residual Functional Capacity

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

[2] Any issue not raised by Plaintiff on appeal is deemed to be waived.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (holding that "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

("RFC") finding at step four and his evaluation regarding the severity of Plaintiff's alleged impairments at step two of the sequential evaluation process; (2) whether the Appeals Council properly denied review of the ALJ's decision; (3) whether the ALJ erred in his credibility determination of Plaintiff; and (4) whether the ALJ failed to develop the record. Because the Court finds that this case must be remanded for consideration of new evidence, it need not address several of Plaintiff's arguments.

## II.   Procedural History and Summary of the ALJ's Decision

On July 7, 2012, Plaintiff filed an application for disability and DIB alleging a disability onset date of June 12, 2011. Tr. 73. Plaintiff alleged disability due to epilepsy, "epilipsy,"[3] and migraines. *Id.* Plaintiff's application was denied initially and upon reconsideration. Tr. 92-97, 100-04. Plaintiff requested and received a hearing before ALJ J. Dennis Reap on December 13, 2013, during which the ALJ appeared by video teleconferencing.[4] Tr. 128-33. Plaintiff appeared and testified at the hearing from Naples, Florida and was represented by counsel during the hearing. Tr. 50, 52. A vocational expert ("VE") appeared by videoconference from Franklin, Tennessee and testified at the hearing. Tr. 54-71.

On February 20, 2014, the ALJ issued a decision finding Plaintiff not disabled from June 12, 2011 through the date of the decision. Tr. 38-43. At step one, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012, and had not engaged in substantial gainful activity

---

[3] Plaintiff does not provide any evidence or argument regarding "epilpsy". Doc. 21 at 3-5. The meaning of the term "epilpsy" remains unclear, and the term "epilipsy" appears to be an alternate spelling of epilepsy.

[4] The ALJ presided over the hearing from Franklin, Tennessee. Tr. 52.

since June 12, 2011. Tr. 40. At step two, the ALJ determined that Plaintiff has the following severe impairment: minor motor seizures. *Id.* At step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* The ALJ then determined that Plaintiff has the RFC to perform the full range of work at all exertional levels, but with the following nonexertional limitations: "no exposure to workplace hazards such as unprotected heights and machinery or other customary hazards such as climbing ladders, ropes and scaffolds." Tr. 41.

Next, the ALJ found that Plaintiff is unable to perform any past relevant work. Tr. 42. Considering Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform and therefore concluded she has not been under a disability from June 12, 2011 through the date of the decision. Tr. 42-43. Plaintiff filed an appeal in this Court on September 8, 2015, and this matter is now ripe for review. Doc. 1.[5]

---

[5] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

### III.    Summary of the Relevant Medical Evidence

#### a.  Evidence Available to the ALJ

Plaintiff's relevant medical records begin on May 22, 2007, when Plaintiff first underwent an Electroencephalogram ("EEG"), which yielded normal results.  Tr. 321.

Plaintiff's treating neurologist, Wendy Robinson Bond, M.D., treated Plaintiff from September, 2009 to August, 2013.  Tr. 228-89.  Dr. Bond's first record of treatment begins with her examination of Plaintiff on March 31, 2010, although Dr. Bond stated that she has last seen Plaintiff on September 23, 2009.  Tr. 254.  Dr. Bond noted that Plaintiff had a long history of seizures, and during the March 2010 visit complained of having difficulty with her balance.  *Id.*  Dr. Bond reported that Plaintiff believed she had experienced a grand mal seizure a day or two prior to her visit.  *Id.*  Dr. Bond's impression from this visit was that Plaintiff had intractable tonic-clonic seizures and cervical spondylotic myelopathy.  *Id.*  Dr. Bond stated that Plaintiff had been on Tegretol[6] for 18 years and at that time was taking 400 mg in the morning and 800 mg at night.  *Id.*  Dr. Bond observed that if Plaintiff continued to have seizures while taking Tegretol at the therapeutic level, Dr. Bond would consider adding Vimpat[7] to her regime, but she did not do so during this visit.  Tr. 256.

During her March 21, 2010 visit with Dr. Bond, Plaintiff admitted that recently

---

[6] Tegretol (carbamazepine) is an anticonvulsant, which works by decreasing nerve impulses that cause seizures and pain.  It is used to treat certain types of seizures (partial, tonic-clonic, mixed). https://www.drugs.com/tegretol.html.

[7] Vimpat (lacosamide) is an anti-epileptic drug, also called an anticonvulsant. It is used together with other medications to treat partial-onset seizures in people with epilepsy who are at least 17 years old. https://www.drugs.com/search.php?searchterm=vimpat.

she had missed doses of Tegretol.  Tr. 254.  Plaintiff also admitted that she had non-epileptiform (pseudo) seizures to get attention from her husband, with whom she was experiencing marital problems.  *Id.*  Plaintiff's neurological and physical exams during this visit were normal, and she had normal activity and energy levels and was oriented to time, place, and person.  Tr. 254-56.  She had increased reflexes throughout.  Tr. 256.  Her recent and remote memory were intact, and her language function and gait were normal.  Tr. 256.

On April 28, 2010, Plaintiff again saw Dr. Bond.  Tr. 249.  Dr. Bond noted that Plaintiff was under a lot of stress and anxiety surrounding her husband.  *Id.*  Plaintiff admitted that she was having pseudo seizures to seek attention from her husband. *Id.*  Plaintiff told Dr. Bond that her last episode lasted several hours, during which Plaintiff hit her husband.  Tr. 249.  Dr. Bond stated that "episodes that [Plaintiff] is calling a seizure" can last up to three to five hours.  Tr. 251.  Although Plaintiff admitted to "act[ing] out for attention," Dr. Bond also noted that Plaintiff has a "real history of seizures," which mainly occur at nighttime.  Tr. 249, 251.  Dr. Bond believed that Plaintiff was emotionally abused by her husband in the past, and that "clearly" Plaintiff was under a lot of stress and anxiety, and so recommended that Plaintiff see a psychiatrist.  *Id.*  Dr. Bond also prescribed a small dose of Celexa.[8]  Plaintiff's neurological and physical exams showed no abnormalities, and she was continued on the same dosage of Tegretol.  Tr. 249-51.  Dr. Bond's impressions were that Plaintiff has intractable tonic-clonic seizures,[9] cervical spondylotic myelopathy, depression,

---

[8] Celexa is used to treat depression. https://www.drugs.com/celexa.html

[9] Dr. Bond's diagnosis of Plaintiff's seizure disorders stays the same until January 5,

and anxiety.  Tr. 251.

On May 24, 2010, Dr. Bond again examined Plaintiff and continued to express her opinion that it was unclear throughout the time she had treated Plaintiff "which seizures are real and which ones are pseudo seizures." Tr. 245.  In Dr. Bond's opinion, Plaintiff did have "real generalized tonic-clonic seizures," but she also had pseudo seizures.  *Id.*  Plaintiff reported to Dr. Bond that since her last visit she had a seizure, which caused numbness and tingling in her toes that traveled upward, and stated that she feels as if the seizure "reset her brain."  *Id.*  As in the previous two visits, Plaintiff's neurological and physical exams were normal.  Tr. 245-48.  Dr. Bond recommended that Plaintiff follow up with a 24-hour EEG to determine whether her seizures are true seizures.  Tr. 248.  Dr. Bond noted that while in a previous visit she recommended that Plaintiff take Celexa for her psychological issues, Plaintiff did not start the medication because she said her husband did not approve of it.  Tr. 245.  Dr. Bond also expressed her recommendation for psychiatric treatment, but noted that at the time Plaintiff's insurance would not cover it.  *Id.*

On July 7, 2010, Plaintiff returned to Dr. Bond, who again acknowledged Plaintiff's long history of actual seizures and pseudo seizures.  Tr. 241.  Although Dr. Bond previously had recommended that Plaintiff get a 24-hour EEG, Plaintiff refused to do so.  *Id.*  Plaintiff again reported that she felt that most of her seizures are pseudo seizures to get attention from her husband.  *Id.*  Dr. Bond also stated that Plaintiff was doing quite well with her seizures.  *Id.*  Plaintiff's neurological and physical

---

2011.  Tr. 237-57.

exams were normal.   Tr. 241-44.   Plaintiff continued taking the same dosage of Tegretol, 400 mg in the morning and 800 mg at night.  Tr. 241.  Dr. Bond expressed her concern about the physical abuse in which Plaintiff was engaging with her husband, and noted Plaintiff had lied to the emergency room physicians, telling them she fell and sustained injuries instead of admitting the domestic abuse.  *Id.*  Dr. Bond recommended that Plaintiff return in six months.   Tr. 244.

Plaintiff returned to see Dr. Bond on January 5, 2011, during which Plaintiff reported that she thought she had about eight seizures within the previous six months, which were mostly nocturnal.  Tr. 237.  Dr. Bond again noted that Plaintiff admitted to having pseudoseizures but opined that Plaintiff also had generalized tonic-clonic seizures.  *Id.*  Dr. Bond further noted that she tried to treat Plaintiff's depression and anxiety but Plaintiff was unable to tolerate several antidepressants and anti-anxiety medication.  *Id.*  Plaintiff's neurological exam was normal but she appeared anxious and depressed.  Tr. 240.

During Plaintiff's next visit to Dr. Bond on February 13, 2012, Dr. Bond reported that Plaintiff recently was started on Phenobarbital and again observed that Plaintiff's seizures mostly are nocturnal, and Plaintiff wakes up with a loss of bladder.[10]  Tr. 228-29.  Dr. Bond noted Plaintiff's history of mental abuse from her husband and her admitting to having pseudoseizure episodes to get his attention, also recognizing that in the past Plaintiff has had generalized tonic-clonic seizures since she was a teenager.   Tr. 229.  Plaintiff's neurological exam was stable, and her gait

---

[10] Dr. Bond consistently noted Plaintiff's history of seizures until she last saw Plaintiff on August 8, 2013.  Tr. 269-70, 276-77, 282-83.

was normal. Tr. 230-31. During this visit, Plaintiff reported to Dr. Bond that her company had closed, she moved, and neither she nor her husband were working, which had added to her stress level. Tr. 229. Dr. Bond noted that she had tried several different anti-depressants and anti-anxiety medications with Plaintiff. *Id.* Dr. Bond expressed her concern about Plaintiff's home situation, stating "I know that her husband has been mentally abusive to her and I do believe that some of her episodes may be pseudoseizures because of some of the abuse." Tr. 231. While acknowledging that Plaintiff already was taking a therapeutic level of Tegretol, Dr. Bond recommended that Plaintiff add Depakote at nighttime, when most of her seizures occurred. *Id.*

On October 29, 2012, Gregory Dowbak, M.D., an orthopedic surgeon, examined Plaintiff for a consultative examination. Tr. 258-63. Plaintiff reported that she had seizures since age eleven with marked increase in the incidence of seizures since October 11, 2012. Tr. 260. Plaintiff told Dr. Dowbak that she has had twenty seizures, three of which were grand mal, but did not require visits to the hospital. *Id.* Plaintiff stated she had a rollover car accident in the year 2010 because she had a seizure while driving.[11] *Id.* Plaintiff stated that she gets a tingling in her feet prior to a seizure, which alerts her to its possible onset. *Id.* Based on his examination of Plaintiff, Dr. Dowbak diagnosed Plaintiff with migraine headaches, a status post-fracture of neck, and a poorly controlled seizure disorder. Tr. 263. Dr. Dowbak also opined that Plaintiff's prognosis was poor. *Id.*

---

[11] Plaintiff contradicts this statement during the hearing before ALJ, instead testifying that she had a car accident in the year 2007. Tr. 60-61.

On November 9, 2012, a state agency physician, Charles E. Moore, M.D., performed a RFC assessment of Plaintiff and determined that Plaintiff has postural and environmental limitations on her ability to work, opining that Plaintiff should avoid concentrated exposure to hazards and not climb ladders, ropes, or scaffolds.  Tr. 87.  Otherwise, Dr. Moore found that Plaintiff has no manipulative, visual, communicative, or exertional limitations on her ability to work.  Tr. 86-87.  The ALJ gave Dr. Moore's opinion great weight to the extent is was consistent with the record, and accounted for Plaintiff's climbing limitation in her RFC.  Tr. 42.

Plaintiff next returned to Dr. Bond on December 17, 2012.  Tr. 282.  She stated that Plaintiff had been sending "confusing" messages to Dr. Bond concerning her medication, and was convinced that taking the Tegretol 200 mg tablets instead of 400 mg tablets was causing her seizures and making her "whole body toxic."  Tr. 283.  Dr. Bond noted that Plaintiff was trying not to take the Tegretol, which Dr. Bond observed might have caused Plaintiff more seizures.  *Id.*  Plaintiff's neurological exam, however, was stable, although she had an odd gait.  Tr. 285.  Her mental status exam also revealed that Plaintiff was awake, alert, and oriented to person, place, and time.  Tr. 284.  Plaintiff had clear and fluent speech; intact memory, attention, and fund of knowledge; and an appropriate mood and affect.  *Id.*

On April 8, 2013, Dr. Bond examined Plaintiff, noting that Plaintiff's Tegretol dosage was increased to 1400 mg (400 mg in the morning and 1000 mg at night) from the 1200 mg she had been taking.  Tr. 276.  Dr. Bond also reported that Plaintiff asked for a prescription for marijuana to treat her seizures and anxiety.  *Id.*  Plaintiff

was using marijuana on a daily basis that she had gotten from a doctor in Colorado. *Id.* She was having more difficulty with her balance. Tr. 277. Plaintiff was negative for behavioral problems, confusion, sleep disturbance, decreased concentration, nervous/anxious behaviors, and hyperactivity. *Id.* Plaintiff also was awake, alert and, oriented to person, place, and time. Tr. 278. Plaintiff had clear speech, intact memory and attention, and appropriate mood. *Id.* Dr. Bond noted that Plaintiff had somewhat of a spastic gait, and increased her dosage of Tegretol to 600 mg in the morning and 1,000 mg at night. Tr. 279.

Four months later, on August 8, 2013, Plaintiff reported to Dr. Bond that she had temporal lobe seizures "all of the time." Tr. 269. Plaintiff again told Dr. Bond that she has seizures to get attention from her husband, but also that she has incontinence every night. Tr. 269-70. Plaintiff reported she was smoking marijuana on a regular basis for her anxiety and her seizures. Tr. 270. Dr. Bond observed that Plaintiff was having more difficulty with balance, and had somewhat of a spastic gait with her right foot turning in. Tr. 270-71. Nonetheless, Dr. Bond reported that Plaintiff still was negative for behavioral problems, confusion, sleep disturbance, decreased concentration, nervous/anxious behaviors, and hyperactivity. Tr. 270. Plaintiff also was awake, alert, and oriented to person, place, and time. Tr. 271. Plaintiff had clear speech, intact memory and attention, and appropriate mood. *Id.* Dr. Bond noted that it has been difficult to treat Plaintiff because she is having both real seizures and non-epileptiform (pseudo) seizures. Tr. 272. Dr. Bond again ordered a 24-hour EEG, noting that Plaintiff's previous issues with her insurance

were alleviated because Plaintiff obtained a Medipass.  *Id.*

On December 23, 2013, Alberto R. Figueroa, M.D., examined Plaintiff.  Tr. 311. Dr. Figueroa noted that Plaintiff has urinary incontinence and grand mal seizures, which occur at night and was taking 1600 mg of Tegretol daily.  *Id.*  Plaintiff reported that she does not feel seizures coming except for tingling in her hand, and then is out for forty minutes.  *Id.*  She stated that her symptoms include generalized shaking of body, urinary incontinence, staring spells, and her head turning to the left.  *Id.* Plaintiff noted that her last seizure occurred the previous Thanksgiving.  *Id.*  Plaintiff also reported she had incontinence during the day two weeks prior.  *Id.*  Similar to Dr. Bond, Dr. Figueroa opined that Plaintiff has a clear history of epilepsy, which is not controlled by Tegretol, and noted that an EEG done in the clinic showed slowing in Plaintiff's left fronto-temporal region.  Tr. 314.  He also added Vimpat to Plaintiff's regime and opined that although it is "unclear" if Plaintiff has PNEA,[12] PNEA is "less likely, but this is always a possibility."  *Id.*

Dr. Figueroa noted that Plaintiff was negative for behavioral problems, confusion, sleep disturbance, decreased concentration, nervous/anxious behaviors, and hyperactivity.  Tr. 312.  In addition, Plaintiff was awake, alert, and oriented to person, place, and time.  Tr. 313.  Plaintiff had clear speech, intact memory and attention, and appropriate mood.  *Id.*  Furthermore, Dr. Figueroa noted that Plaintiff's EEG showed no evidence to support a diagnosis of seizures.  Tr. 318.  The

---

[12]PNEA stands for Psychogenic Non-Epileptic Attacks, or pseudo seizures.  AMERICAN ASSOCIATION FOR MARRIAGE AND FAMILY THERAPY. http://www.aamft.org/imis15/AAMFT/Content/Consumer_Updates/PNEA.aspx.

EEG only revealed evidence of mild left and right temporal dysfunction of unknown clinical significance.  *Id.*  Furthermore, Dr. Figueroa stated that, "[Plaintiff's] memory is terrible, but she smokes '3 bowls' of marijuana daily," questioning whether Plaintiff's decreased memory was caused by her use of marijuana.  Tr. 312.  Dr. Figueroa directed Plaintiff to return in two months.  Tr. 316.

On December 30, 2013, Alan Tannenbaum, M.D., examined Plaintiff.  Tr. 308-10.  The medical records from this visit reveal that Plaintiff was back to taking only 800 mg of Tegretol per day.  Tr. 308.  Dr. Tannenbaum determined that Plaintiff was positive for decreased memory, incoordination, and seizures.  *Id.*  Plaintiff's psychiatric and neurological exams were otherwise normal; she appeared alert, cooperative, oriented, and normal.  Tr. 308-10.  Dr. Tannenbaum determined that Plaintiff was stable, and recommended Plaintiff to continue on her medications.  Tr. 310.

### b.   New Evidence Presented to the Appeals Council

Plaintiff submitted the following new evidence to the Appeals Council: the evaluation of the psychologist, Christine Needham, EdD, dated April 24, 2014, and Plaintiff's Electroencephalogram ("EEG"), dated March 2, 2015.[13]  Doc. 21 at 13-14.

Dr. Needham's report consisted of the following: background information summarizing Dr. Needham's interview with Plaintiff; a mental status examination; intelligence testing using the Wechsler Abbreviated Scale of Intelligence;

---

[13] Plaintiff states she submitted this EEG to the Appeals Council; however, it is not part of the record.  Doc. 21 at 6.  Plaintiff has attached the EEG as an exhibit to her Memorandum in Support of the Complaint.  Doc. 21-1.

Achievement Testing, and personality testing.   Tr. 25-27.   Dr. Needham also completed a psychiatric medical source statement.   Tr. 28-31.   During her mental status examination, Plaintiff was extremely cooperative; she displayed a pleasant and upbeat mood; her speech was clear and well organized; her insight and judgment were good.   Tr. 26.   The testing revealed that Plaintiff's full scale IQ is 99 (101 verbal and 95 performance), which is in the average range; her reading level is in the low average range (equivalent to eighth grade); her sentence comprehension is at the borderline range (equivalent to seventh grade); and her spelling and math abilities are in the low range.   *Id.*   Dr. Needham's diagnosis included specific learning disability with impairments in reading, mathematics, and written language; and generalized anxiety disorder, among others.   Tr. 27.

Dr. Needham opined that Plaintiff had *marked* limitations on ability to make judgments based on simple work related decisions; ability to accept instructions and respond appropriately to criticism from supervisors.   Tr. 31.   Dr. Needham further opined that Plaintiff had *extreme* functional limitations on ability to remember locations and/or work like procedures; ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to complete a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace; and ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. *Id.*   Dr. Needham further opined that considering Plaintiff's condition, medication,

age, and medical history, Plaintiff has been experiencing these limitations since at least age thirteen. *Id.*

The twenty-four hour EEG was performed from February 23, 2015 to February 24, 2015; and it was recorded on March 2, 2015, one year after the ALJ's decision. Doc. 21-1. On the first day, the EEG result was mildly abdonarmal. *Id.* at 1. Plaintiff had a documented seizure on February 24, 2015. *Id.* at 2. The report concludes that "[t]his EEG is consistent with the clinical diagnosis of seizure disorder." *Id.* at 2.

## IV.    Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Commissioner has established a five-step sequential analysis for evaluating a claim of disability. *See* 20 C.F.R. § 416.920. The Eleventh Circuit has summarized the five steps as follows:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in "significant numbers in the national economy."

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (citing 20 C.F.R. §§ 416.920(a)(4), (c)-(g), 416.960(c)(2); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The claimant bears the burden of persuasion

through step four; and, at step five, the burden shifts to the Commissioner. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (finding that "[s]ubstantial evidence is something more than a mere scintilla, but less than a preponderance") (internal citation omitted).

The Eleventh Circuit recently has restated that "[i]n determining whether substantial evidence supports a decision, we give great deference to the ALJ's fact findings." *Hunter v. Soc. Sec. Admin., Comm'r,* 808 F.3d 818, 822 (11th Cir. 2015) (citing *Black Diamond Coal Min. Co. v. Dir., OWCP,* 95 F.3d 1079, 1082 (11th Cir. 1996)). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). "The

district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings). It is the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. *Lacina v. Commissioner,* 2015 WL 1453364, at *2 (11th Cir. 2015) (citing *Grant v. Richardson,* 445 F.2d 656 (5th Cir.1971)).

## V.   Discussion

### a. *Whether substantial evidence supports the ALJ's RFC finding at step four*

Plaintiff argues that the ALJ neither sufficiently articulated his findings to allow meaningful judicial review nor properly evaluated the medical opinions of the doctors who evaluated or treated Plaintiff. Doc. 21 at 8. Plaintiff asserts that the ALJ's discussion of Plaintiff's medical evidence is deficient and is contrary to the medical records, which clearly show Plaintiff's long history of seizures and prescription of seizure medications. *Id.* at 9. The Commissioner responds that the ALJ is not required to use any particular phrases or formulations in his decision; and in this case, substantial evidence supports the ALJ's decision. Doc. 22 at 4-8.

In his RFC assessment, the ALJ noted the following:

> The claimant has a longstanding history of seizures, but their frequency is not well documented and her medications are at therapeutic levels. (Exhibits 1F&3F). Significantly, the claimant's seizures usually occur at night and can therefore not be expected to cause more limitations than the standard seizure precautions. More significant, however, is the

notation by her neurologist on several occasions, that the claimant has admitted to faking seizures in order to get her husband's attention and that it is impossible to know which seizures are actual seizures and which are merely pseudoseizures. She also has refused psychiatric treatment to assist with her pseudoseizures. The record fails to provide clear documents of on-going seizures and the limitations assigned to the claimant by the undersigned reflect the benefit of significant doubt as to whether seizures occur at all, much less whether seizures would occur with patient compliance.

Tr. 41-42.

In the Eleventh Circuit, the law is clear that "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179 (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)) (per curiam). The court reiterated in *Winschel*, "[i]n the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." 631 F.3d at 1179 (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). An ALJ who fails to "state with at least some measure of clarity the grounds for his decision" cannot be affirmed because the court cannot perform its duty to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* (citations omitted).

The court has no rigid requirement, however, "that the [ALJ] specifically refer to every piece of evidence in his or her decision, so long as the decision is not a broad rejection that leaves the district court [] with insufficient information to conclude whether the [ALJ] considered the claimant's medical condition as a whole." *Hunter*, 609 F. App'x at 557 (internal quotation marks omitted). If the ALJ commits an error,

"the error is harmless if it did not affect the judge's ultimate decision." *Id.* at 558 (holding that the ALJ's failure to state with particularity the weight assigned to the doctors' medical opinion was harmless because it did not affect the ALJ's ultimate decision).

Here, the Court could find that substantial evidence supports the ALJ's RFC finding, *Cf. Winschel,* 631 F.3d at 1178, except that the new evidence that should have been considered by the Appeals Council could reasonably change the result.[14] As the Commissioner accurately asserts, contrary to Plaintiff's arguments, the ALJ acknowledged Plaintiff's longstanding history of seizures, but also observed that "their frequency is not well documented and her medications are at therapeutic levels." Doc. 22 at 5; Tr. 41.  In support, the ALJ discussed specific evidence in detail such as, "[Plaintiff's] seizures usually occur at night and can therefore not be expected to cause more limitations than the standard seizure precautions," and "[Plaintiff] has admitted to faking seizures in order to get her husband's attention and that it is impossible to know which seizures are actual seizures and which are merely pseudoseizures." Tr. 41.

Although the ALJ's decision does not identify the physician by name, the evidence discussed above is a summary of Dr. Bond's treatment notes and shows that the ALJ considered Dr. Bond's medical opinions. Tr. 41, 249, 269-70.  Dr. Bond noted that the result of Plaintiff's EEG on May 22, 2007 was normal.  Tr. 321-22.  As fully outlined above, Plaintiff's medical records show that Dr. Bond's treatments notes are

---

[14] See discussion, *infra.*

replete with contradictory evidence regarding nature and extent of Plaintiff's seizures. Although Dr. Bond consistently noted that Plaintiff had a long history of seizures dating back to her teenage years, which occurred mostly at night and caused Plaintiff to wake up with a loss of bladder, Plaintiff also consistently admitted to faking her seizures to get her husband's attention and refused to see a psychiatrist or undergo an EEG. Moreover, most of Plaintiff's neurological examinations were normal.

Likewise, the treatment notes from other physicians who examined Plaintiff provide conflicting evidence concerning Plaintiff's alleged seizures. Dr. Dowbak noted, and the ALJ discussed, that Plaintiff could cook and dress herself "all the time," clean and do laundry two to three times per week, shower by herself, play sports, and socialize with her friends. Tr. 42, 261. During her visit to Dr. Dowbak, Plaintiff appeared in no acute distress, and her gait was normal. Tr. 262. Plaintiff could walk on heels and toes without difficulty and squat fully. *Id.* Dr. Dowbak also observed that Plaintiff appeared oriented and had no sensory deficit. Tr. 263. Although Dr. Dowbak opined that Plaintiff's prognosis was poor, he did not render any opinion on Plaintiff's ability to perform basic work. *Id.* The ALJ discussed in his decision Dr. Dowbak's findings of Plaintiff's daily activities.

The Court notes that the ALJ did not specifically refer to Dr. Figueroa and Dr. Tannenbaum's treatment notes. Dr. Figueroa noted that Plaintiff's EEG showed no evidence to support a diagnosis of seizures. Tr. 318. The EEG only revealed evidence of mild left and right temporal dysfunction of unknown clinical significance. Tr. 318.

Despite Dr. Figueroa's findings, the ALJ's decision did not explicitly reference to Dr. Figueroa's opinion.   Dr. Tannenbaum determined that Plaintiff was stable, and recommended Plaintiff to be continued on medications. Tr. 310.  He also opined that all services, testing, evaluation, and management charges are clinically necessary to appropriately establish a diagnosis and/or clinical care.  *Id.*  The ALJ did not explicitly reference to Dr. Tannenbaum's opinion in his decision either.   Neither doctor, however, opined as to any functional limitations.

All of the medical records discussed above are consistent and support conclusions that: (1) Plaintiff has a long history of seizures, which mostly occur at night, (2) despite Plaintiff's clear history of seizures, it has been difficult to determine and confirm Plaintiff's seizures, and (3) Plaintiff's medical records do not establish any limitations on Plaintiff's ability to work.   Drs. Bond, Figueroa, and Dowbak clearly diagnosed Plaintiff with a seizure disorder and conceded her long history of seizures.   Drs. Bond and Figueroa also noted that Plaintiff's seizures mostly are nocturnal.  Dr. Bond opined many times that Plaintiff's seizure mostly occur at night.  Consistent with Dr. Bond, even Dr. Figueroa to whom Plaintiff reported having urinary incontinence during the day still noted that most of Plaintiff's seizures occur at night.

Plaintiff, however, admitted to Dr. Bond that she faked seizures to get her husband's attention.   As a result, Dr. Bond consistently found difficult to treat Plaintiff because Plaintiff has had both actual and pseudo seizures.  Both Dr. Bond and the ALJ observed that although Plaintiff might have some actual seizures, it is

difficult to identify which seizures are real.  Tr. 41, 246, 272.  Plaintiff's EEGs on May 22, 2007 and December 23, 2013 did not support a diagnosis of epilepsy.  Tr. 318, 321.

In fact, Dr. Bond noted that Plaintiff's neurological examinations were stable or normal during a number of visits: on May 24, 2010, July 7, 2010, January 5, 2011, February 3, 2012, and December 17, 2012.  Tr. 231, 240, 244, 248, 285.  Furthermore, Dr. Bond assessed on December 17, 2012, April 8, 2013, and August 8, 2013 that (1) Plaintiff was awake, alert, and oriented; (2) Plaintiff was negative for behavioral problems, confusion, decreased concentration, nervous/anxious behaviors, and hyperactivity; and (3) Plaintiff had clear speech and intact memory and attention.  Tr. 270-71, 277-78, 283-84.  The only abnormalities other than seizures, anxiety, and depression revealed by Plaintiff's physical and neurological exams were Plaintiff's increased reflexes or odd gaits.  In addition, none of the examining physicians opine as to any limitations Plaintiff's seizures impose on her ability to perform work.  As noted by the ALJ, Plaintiff's medication remained at the therapeutic level, although it increased in doses between the years 2012 and 2013.

Based on the above analysis, like in *Hunter*, the ALJ here discussed and summarized the relevant opinions of Plaintiff's treating physicians, although he did not identify the physicians by name, and substantial evidence supports the ALJ's RFC finding based on the evidence before him at that time.  609 F. App'x at 558; *cf. Winschel,* 631 F.3d at 1178.  The ALJ's clear discussion of Plaintiff's medical records supported by substantial evidence distinguishes this case from *Winschel*, in which the Eleventh Circuit ordered the ALJ to consider and explain the weight accorded to

the medical opinions because the ALJ did not mention the treating physicians' medical opinions or discuss pertinent elements of the examining physicians' medical opinions.  *Winschel*, 631 F.3d at 1179.  Plaintiff also does not show that Plaintiff's medical records available to the ALJ prior to his decision support a different determination.  Docs. 21, 25.

As a result, like *Hunter*, to the extent that ALJ did not specify the weight accorded to the treating physicians' opinions, the error was harmless because it did not affect the ALJ's ultimate decision.  *Hunter*, 609 F. App'x at 558 (holding that the ALJ's failure to state with particularity the weight assigned to the doctors' medical opinion was harmless because it did not affect the ALJ's ultimate decision); *Tillman v. Comm'r, Soc. Sec. Adm.*, 559 F. App'x 975, 975 (11th Cir. 2014) ("Ordinarily, an ALJ's failure to explain the particular weight given to the different medical opinions provided is reversible error.  However, when the ALJ's error did not affect its ultimate findings, the error is harmless.").   As noted earlier in the opinion, however, although substantial evidence, that was available to the ALJ at the time he rendered his decision, supports the ALJ's findings at that time; newly submitted evidence to the Appeals Council could reasonably change the result, and should have been considered.

>   b.  *Whether the Appeals Council properly denied review of the ALJ's decision*

As noted, Plaintiff submitted the following new evidence to the Appeals Council: Dr. Needham's evaluation dated April 24, 2014 and Plaintiff's EEG, dated March 2, 2015.  Doc. 21 at 13-14.  Dr. Needham assessed that Plaintiff had several

extreme and marked limitations on her ability to perform work, and also diagnosed Plaintiff with an anxiety disorder. Tr. 27-31. The EEG was consistent with a clinical diagnosis of seizure disorder. Doc. 21-1 at 2. The Appeals Council decided that the evidence does not affect the ALJ's decision because the evidence is dated after the ALJ's decision issued on February 20, 2014. Tr. 2. The decision of the Appeals Council does not discuss the EEG.

Plaintiff asserts that the Appeals Council erred by denying Plaintiff's request for review based on her new evidence. Doc. 21 at 12-13. Plaintiff argues that Dr. Needham's findings are new and material because they bolster other medical evidence on records and change the weight of evidence. *Id.* at 13. Plaintiff also claims that the result of the EEG confirms Plaintiff's seizure disorder, eliminating the ALJ's doubt as to whether Plaintiff's seizures actually exist. *Id.* at 15. The Commissioner responds that Dr. Needham's opinion would likely not change the administrative outcome because her opinion conflicts with other evidence of record. Doc. 22 at 13-14.

"[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." *Ingram,* 496 F.3d at 1262 (citation omitted). Although the Appeals Council has the discretion not to review the ALJ's denial of benefits, *See* 20 C.F.R. § 416.1470(b), it "must consider new, material, and chronologically relevant evidence" that the claimant submits. *Ingram,* 496 F.3d at 1261; *see also* 20 C.F.R. §§ 404.970(b), 416.1470(b). *Washington v. Soc. Sec. Admin., Com'r,* 806 F.3d 1317, 1320

(11th Cir. 2015).   Whether evidence meets the new, material, and chronologically relevant standard is a question of law subject to our *de novo* review by the reviewing court.   *Washington*, 806 F.3d at 1321 (11th Cir. 2015).

New evidence is noncumulative.  *Id.* at 1321 n. 6 (citing *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986)).   For evidence to be "new and noncumulative," it must relate to the time period on or before the date of the ALJ's decision, "but was not discovered until after the ALJ hearing."   *See* 20 C.F.R. § 404.970(b).   The Commissioner's policies state that new evidence is chronologically relevant only if it is "dated before or on the date of the ALJ decision, or [] post-dates the ALJ decision but is reasonably related to the time period adjudicated by the ALJ." *See* HALLEX § I-3-3-6(B)(3), 1993 WL 643129 (S.S.A.); 20 C.F.R. §§ 404.970(b); 416.1470(b).  Thus, a treating physician's opinion based on treatment occurring after the date of the ALJ's decision may nevertheless be chronologically relevant.  *Washington*, 806 F.3d at 1322-23.   Furthermore, evidence is material if "there is a reasonable possibility that [it] would change the administrative result." *Id.* at 1321. (citing *Hyde v. Bowen*, 823 F.2d 546, 459 (11th Cir. 1987)(quotations omitted).

Here, the Commissioner argues that Dr. Needham's report would not change the administrative result because her opinion conflicts with the mental status examination evidence in the record from Plaintiff's treating neurologist.  Doc. 22 at 13.  The Commissioner points to several mental status examinations that were generally normal.  *Id.*  As noted earlier, a number of Plaintiff's neurological examinations were normal; however, despite these normal results, Dr. Bond

consistently recommended that Plaintiff see a psychiatrist, expressed serious concern about Plaintiff's mental well-being, and continuously renewed her recommendation for Plaintiff to seek professional help. *See e.g.*, Tr. 244, 245, 251. Dr. Bond made these recommendations on the same day that she recorded Plaintiff's normal mental status examination results. Thus, although she recorded Plaintiff's mood, effect, concentration, and fund of knowledge within normal range, these mental exam results did not stop her from recommending Plaintiff for psychiatry and treating her with appropriate medication to address Plaintiff's mental conditions.

As noted, Plaintiff fell in the low average or borderline range on her reading, sentence comprehension, spelling, and math skills. Tr. 26. Dr. Needham based her opinions on the combined effects of Plaintiff's anxiety disorder and her limited cognitive abilities, and noted several marked or extreme limitations. The report comprises of Plaintiff's evaluation, testing, and personal and medical history. Tr. 25-31. Dr. Needham opined that based on a review of the medical history, treatment rapport, and Plaintiff's evaluation, she could conclude with a reasonable degree of medical certainty that Plaintiff had the functional limitations since the age of thirteen. Tr. 31. Thus, Dr. Needham's opinion about Plaintiff's cognitive defects and functional limitations relate back to the period before the ALJ's decision. *See Washington*, 806 F.3d at 1322-23. Prior to the ALJ's decision, the record did not contain any information on Plaintiff's cognitive or mental functional limitations, and there is no assertion that Plaintiff's cognitive skills declined in the period following the ALJ's decision. Thus, the Court concludes that Dr. Needham's report is

chronologically relevant, even though her evaluation of Plaintiff occurred after the date of the ALJ's opinion.   Despite the conflicting evidence of record showing Plaintiff's normal mental examination results, there is a reasonable possibility that Dr. Needham's opinion would change the administrative result, particularly in light of Dr. Bond's continued recommendations that Plaintiff seek psychiatric treatment despite those normal results.   Because this evidence was new, material, and chronologically relevant, the Appeals Council erred in failing to consider it.

With regard to the EEG, as the Commissioner argues, this evidence likewise is neither new nor material because it does not concern the relevant time period, and the ALJ already considered Plaintiff's seizure disorder.  Doc. 22 at 14.  The EEG was performed on March 2, 2015, one year after the ALJ's decision.  Doc. 21-1.  The EEG confirms a clinical diagnosis of seizure disorder, something that the ALJ seriously doubted.   Thus, it is likely that the submission of the EEG could change the administrative result.

Plaintiff also argues that the ALJ erred in the following respects: in failing to consider Plaintiff's anxiety disorder in evaluating the severity of Plaintiff's impairments at step two; in evaluating Plaintiff's credibility; and in failing to develop the record.   Because this case must be remanded for consideration of the new evidence, the Court need not address these arguments.

ACCORDINGLY, it is respectfully

**RECOMMENDED:**

1.      The decision of the Commissioner be **REVERSED** and this matter be

**REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),

for the Commissioner to:

    A.      Consider the new evidence provided to the Appeals Council;

    B.      Review and consider all of Plaintiff's medical records concerning

her alleged impairment of seizures and anxiety disorder and determine

the weight to be given to such evidence and the reasons therefor, and,

further:

        i.      whether it constitutes a severe impairment at step two;

        ii.     the effect, if any, it has on his assessment of Plaintiff's RFC

                in combination with her other impairments; and

        iii.    the effect, if any, on the hypothetical presented to the VE;

    C.      Re-evaluate Plaintiff's credibility in light of the new evidence;

    D.      Make any other determinations consistent with this Opinion and

Order, or in the interests of justice.

    **DONE** and **ENTERED** in Fort Myers, Florida on this 31st day of January,

2017.

CAROL MIRANDO
United States Magistrate Judge

Copies: Counsel of record